**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ronald J. Eisenlord,<br><br>                Plaintiff,<br><br>vs.<br><br>Carolyn W. Colvin,<br>Acting Commissioner of Social Security,<br><br>                Defendant. | No. CV-11-751-TUC-BGM<br><br><br>**ORDER** |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 21).  A response has been filed, but no reply.  Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g).  The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure. The Court takes judicial notice that Michael J. Astrue is no longer Commissioner of the Social Security Administration ("SSA").  The Court will substitute the new Acting Commissioner of the SSA, Carolyn W. Colvin, as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.  *See also* Fed. R. App. P. 43(c)(2).

# I.    BACKGROUND

## A.    *Procedural Background*

On June 2, 2008, Plaintiff filed an initial application for Social Security Disability Insurance Benefits ("DIB") for an allegedly disabling condition due to "severe back pain,

brittle diabetes, heart, [sic] high blood pressure, hypertensive cardiovascular disease, hypertension, Hepatitis C, depression, bulging disc injury, peripheral neuropathy, and peripheral artery disease" that arose on November 19, 2004.[1]  Administrative Record ("AR") at 79; 124; 143.  The Social Security Administration ("SSA") denied this application on August 27, 2008.  *Id.* at 79.  On September 12, 2008, Plaintiff filed his request for reconsideration.  *Id.* at 84.  On December 24, 2008, upon reconsideration, SSA again denied benefits.  *Id.* at 85.  Plaintiff filed his request for hearing on January 7, 2008.  *Id.* at 89.  On January 5, 2010, a hearing was held before ALJ M. Kathleen Gavin.  AR at 46.  The ALJ issued an unfavorable decision on June 14, 2010.  *Id.* at 23-36.  On July 1, 2010, Plaintiff requested review of the ALJ's decision by the Appeals Council.  *Id.* at 22.  On September 23, 2011, Plaintiff's appeal was denied.  *Id.* at 1.  Plaintiff filed this cause of action on November 22, 2011.  Compl. (Doc. 1).

### B.   Factual Background

Plaintiff was fifty-five (55) years old at the time of the administrative hearing, and forty-nine (49) at the time of the alleged onset of his disability.  AR at 50, 124.  Plaintiff finished the eleventh grade, but never completed a GED.  *Id.* at 51.  Prior to his alleged disability, Plaintiff worked as a journeyman carpenter.  *Id.* at 52, 180.  He has also worked as a surveying helper.  *Id.* at 180.

At the administrative hearing, Plaintiff testified that he falls a lot because his legs give out, and has pain in his legs and back.  *Id.* at 53.  Plaintiff testified that his back pain was in his "lower back at L5-S1, and . . . L4" with a burning, stabbing pain going down his legs. AR at 53-54.  Plaintiff testified that his pain, while on medication is "[u]sually about a eight to nine."[2]  *Id.* at 54.  Plaintiff also testified that his medication causes him to be sick and

---

[1]The Administrative Law Judge (ALJ) stated  in her decision that Plaintiff initially filed for benefits on June 2, 2008.  The record, however, reflects that he completed his application on June 5, 2008.  *See* AR 124.

[2]On a scale of one (1) to ten (10), with ten (10) the worst pain imaginable.  AR at 54.

nauseated, as well as lose his balance. *Id.* Plaintiff testified that he has a hard time concentrating. *Id*. at 55. Plaintiff testified that he has Hepatitis C, which causes him to feel constantly tired. *Id.* at 40. Plaintiff further testified that he was given Interferon treatment for about seven (7) months, approximately two (2) years prior to the hearing. AR at 55. The treatment was unsuccessful. *Id.* Plaintiff testified that his high blood pressure affects his ability to work by causing him to get dizzy and lightheaded. *Id.* at 56. Plaintiff further testified that his blood pressure is sometimes low and sometimes really, really high. *Id.* at 57. Finally, Plaintiff testified that he "get[s] really emotional from constantly taking the medication and nothing helping." *Id.* Plaintiff takes Prozac for his depression. AR at 58.

Plaintiff described his typical day as waking up around noon or one o'clock in the afternoon. *Id.* Plaintiff testified that because he has difficulty sleeping, he takes naps during the day. *Id.* at 59. Plaintiff stated that he generally sleeps between three (3) and five (5) hours per night, and does not sleep at all every other day. *Id.* at 62. Plaintiff tries to do work around the house, "but it's really hard." *Id.* at 59. Plaintiff further testified that he tries "to do a little bit of laundry . . . [and] [l]oad the dishwasher." AR at 59. Plaintiff does not dress every day, although he can. *Id*. Usually, this is because he is more comfortable "wearing [his] pajama bottoms and a T-shirt[.]" *Id.* at 62. He also testified that he has problems taking a shower due to his balance issues. *Id.* at 59. Plaintiff testified that he "fall[s] probably a couple times in a week." *Id.* at 62.

Plaintiff's wife manages the money and does the cooking. AR at 59. Plaintiff stated that his wife also grocery shops, but that he will "go with her and go around on the little cart." *Id*. Furthermore, his wife and grandson do the yard work. *Id.* at 60. Plaintiff watches television and sleeps when possible. *Id*. Plaintiff has been to a couple of his grandson's plays, although he cannot sit through the entire performance. *Id.* Plaintiff testified that he tries to exercise, "but it's really difficult." AR at 60. He "tr[ies] to do leg exercises[,] . . . tr[ies] to bend over and touch [his] toes . . . [and do] [l]eg raises." *Id.* Plaintiff testified that he used to fish, hunt, camp, play baseball and ride on a quad; however, he is unable to do

those hobbies any longer. *Id.* at 60-61. Plaintiff testified that they go out to dinner and to the movies. *Id.* at 61. Plaintiff estimated that he can sit for approximately ten (10) to fifteen (15) minutes wihout a problem, and stand for on average fifteen (15) to twenty (20) minutes. *Id.* He can walk one hundred (100) feet on level ground using crutches, and can lift maybe five (5) to ten (10) pounds. AR at 61-63. It takes Plaintiff approximately ten (10) minutes of sitting to recover and begin walking again. *Id.* at 63

Ms. Victoria Rei, a vocational expert, also testified at the administrative hearing. *Id.* at 65. Ms. Van Vleet testified that she had reviewed the exhibits from Plaintiff's file prior to the hearing, but was neither personally acquainted nor had any prior professional contact with him. *Id.* at 65-66. Ms. Rei testified that Plaintiff's job as a journeyman carpenter was considered "medium exertion level, SVP-7, skilled." *Id.* at 66. Ms. Rei stated that the DOT number was 860.381-022. AR at 66. Ms. Rei further testified that Plaintiff's knowledge about wood could provide job opportunities in "semi-skilled, light exertion level inspector type positions." *Id.* at 67. The ALJ asked Ms. Rei, hypothetically, if there were any jobs within those Ms. Rei previously listed , limited to simple unskilled work, for a person who was limited to the light exertional level, but only occasional postural functions. *Id.* Ms. Rei responded no, because none of the jobs were unskilled. *Id.* The ALJ asked a further hypothetical regarding the availability of jobs for someone closely approaching advanced age, with a limited education. *Id.* at 67-68. Ms. Rei opined that such a person could work as an Assembly Inspector, Assembler of Small Products, or inspector packager. AR at 68. These positions would all have limited contact with the general public. *Id.* Ms. Rei further testified that these jobs would remain the same adding a sit/stand option. *Id.* Finally, the ALJ asked about the availability of jobs if Plaintiff could do light work, but would not be able to sustain it eight hours a day, five days a week, and will have limitations due to his medications and balance problems, and is likely going to miss more than two days a month. *Id.* at 68-69. Ms. Rei responded that there would not be any jobs available under such a circumstance. *Id.* at 69. Counsel questioned Ms. Rei regarding transferability of some of the

1   skills required to the jobs she listed.  AR at 69-71.  Ms. Rei responded that the DOT lists
2   wood and paper pulp wood jobs together.  *Id.* at 71.

3       On January 19, 2005, Plaintiff was seen by Peggy Avina, M.D. because he injured his
4   left leg in a stack of wood one month prior. *Id.* at 215.  Subsequently, he dropped a hammer
5   on it one week prior to being seen by Dr. Avina.  *Id.*  A venous dopler of Plaintiff's left lower
6   extremity was performed the same day.  *Id.* at 218, 643-44, 864-65.  Alan K. Osumi, M.D.,
7   Ph.D. read the results and found "[n]o evidence of deep venous thrombosis." AR at 218, 643-
8   44, 864-65.  An x-ray was also taken of Plaintiff's foot, and Dr. Osumi concluded that the
9   views showed an "[u]nremarkable left foot."  *Id.* at 217, 645-46, 866-67.  Dr. Avina gave
10  Plaintiff a prescription for Vicodin. *Id.* at 215.

11      On April 4, 2005, Plaintiff was again seen by Dr. Avina for left foot and ankle pain
12  and lower back pain.  *Id.* at 213.  Dr. Avina noted that Plaintiff would likely need an MRI
13  and then a neurology evaluation.  *Id.*  Meanwhile, she prescribed Toradol and Vicondin.  AR
14  at 218.  On April 14, 2005, Plaintiff had an MRI which showed "[m]ild degenerative changes
15  seen at the L3-L4 level," but "[n]o bony destructive process . . . noted [and] [n]o
16  spondylolysis . . . seen."  *Id.* at 211.  On April 20, 2005, Dr. Avina had a follow-up with
17  Plaintiff, noting that he was "[a]ble to maneuver [up] and to table better than last w[ee]k."
18  *Id.* at 212.  Dr. Avina again prescribed Toradol, as well as Naproxen. *Id.*

19      On May 5, 2005, Plaintiff saw Dr. Avina regarding his left foot pain, he also reported
20  that he had quit smoking one month prior.  *Id.* at 208.  Dr. Avina reviewed Plaintiff's lab
21  results and directed him to follow-up in two weeks.  AR at 208.  She prescribed
22  Amitriptyline for depression, Ibuprofen and Vicodin.  *Id.*  On May 15, 2005, Plaintiff was
23  seen at Chiricahua Community Health Centers, Inc., where Dr. Avina practices, for a
24  possible insect bite; however, the records do not indicate that he followed up with Dr. Avina.
25  *Id.*  On May 17, 2005, Plaintiff reported to chiropractor Roger W. Roberts that he was "able
26  to work yesterday doing some phys[ical] act[ivity.]" *Id.* at 1101.

27      On June 15, 2005, Plaintiff was seen as a new patient by Joshua Dopko, M.D. *Id.* at
28

372; *see also* 284.  Plaintiff's chief complaint was lower back pain, and he reported that he had quit smoking three months prior, and did not use alcohol or drugs.  AR at 369.  Dr. Dopko reported that Plaintiff's hypertension was poorly controlled, and he had chronic lower back pain for which the doctor was concerned had nerve involvement.  *Id.* at 371.  Dr. Dopko requested a MRI and referred Plaintiff to Dr. Cary for evaluation and pain management.  *Id.* Dr. Dopko also gave Plaintiff a prescript for Vicodin.  *Id.*  On June 21, 2005, Plaintiff's insurance denied a L-spine MRI as a pre-existing condition.  *Id.* at 374.  On June 27, 2005, Plaintiff called Dr. Dopko and reported having pain in lower back and difficulty urinating.  AR at 347.  On the same day, Plaintiff was seen in the Emergency Department ("ED") of the Sierra Vista Regional Health Center ("SVRHC") for back pain.  *Id.* at 636-39, 853-56.  Plaintiff was given two injections of Demerol and one of Phenergan.  *Id.* at 639, 856.  Plaintiff also had an unenhanced CT of his L-spine.  *Id.* at 296, 366, 642, 857.  Gary R. Forsberg, D.O. reported that:

> There is a small to moderate broad-based disc bulge at L5-S1 which encroaches upon the inferior aspect of the left lateral recess and could affect the exiting nerve root.  There is no evidence of actual herniated nucleus pulposus.  There is no evidence of spinal stenosis.  Lumbar vertebrae appear to be in satisfactory position.

> IMPRESSION: Broad-based disc bulge, slightly eccentric to the left, at L5-S1, which could affect the exiting nerve root within the lateral recess.

*Id.* at 269, 366, 642, 1181.  On June 29, 2005 was seen by Guy C. Cary, III, M.D. for a nerve conduction study and EMG.  AR at 272, 350.  Dr. Cary reported that "[t]his is a normal electrophysiological exam in a patient with clinical irritative lumbar radiculopathy."  *Id.*; *see also id.* at 273-77; 357-63.  Dr. Cary further reported that "[t]here is no atrophy seen in either lower extremity."  *Id.* at 279, 353.  Dr. Cary recommended "low back exercises and water aerobics[.]"  *Id*. at 281, 355.  On this same date, Plaintiff was examined by R. M. Gladding, D.O. who reported "1  [hypertension] by history[;] 2  heart murmur[;] 3 wheezing, chronic obstructive lung disease[;] [and] 4 rectal bleeding, note right upper quadrant tenderness[.]" *Id.* at 283, 349.  Dr. Gladding further reported that "[t]here is not much for me to do[.]" AR

1   at 283, 349. at 283, 349.

2          On July 1, 2005, Plaintiff was seen at SVRHC ED for lower back pain. *Id.* at 627-30,

3   847-50.  Plaintiff was given Dilaudid and Phenergan intravenously and intramuscularly.  *Id.*

4   at 630, 850.  Plaintiff was discharged to home with prescriptions for Percocet.  *Id.*  On July

5   6, 2005, Plaintiff was seen by Dr. Dopko for a follow up regarding his hypertension and back

6   pain.  *Id.* at 237-39, 344-46.  Dr. Dopko prescribed Toprol and Hydrochlorothiazide for

7   hypertension.  AR at 238, 345.  Regarding Plaintiff's back pain, Dr. Dopko stated:

8          Chronic low back pain.  He has had very little relief with Vicodin.  The patient
           is encouraged to keep his appointment with Dr. Cary and come back to get an
9          [sic] MRI to see how bad his back is.  With as much pain as he is in, I think it
           would be appropriate to start him on MS Contin 30 mg b.id. and to switch him
10         from Vicodin to Percocet 7.5/3.5.  Follow-up will be in two weeks.

11  *Id.*  Later that day, Plaintiff called to inform Dr. Dopko's office that insurance would not

12  cover the prescriptions as written.  *Id.* at 343.  Dr. Dopko's note reflects that Plaintiff "must

13  bring in old script or if [at] pharmacy must call and void."  *Id.*  Subsequently, Dr. Dopko

14  called the pharmacy and voided the previous prescriptions.  *Id.* at 345.

15         On July 12, 2005, Plaintiff returned to Dr. Cary for a follow-up for irritative lumbar

16  radiculopathy.  AR at 258, 334.  Dr. Cary reported Dr. Gladding cleared Plaintiff based on

17  his cardiology evaluation, and the urology evaluation showed no urological problems.  *Id.*

18  Dr. Cary noted that a lumbrosacral MRI was scheduled for July 20, 2005.  *Id.*  Dr. Cary

19  recommended *inter alia* continuing with the low back exercises and water aerobics, gave

20  Plaintiff a Ten's Unit, and physical therapy.  *Id.* at 260, 338, 339.  On July 15, 2005, Plaintiff

21  saw Jeffrey M. Wolk, M.D. because he was having difficulty urinating. *Id.* at 261-62, 329-31.

22  Dr. Wolk sought a urine study and prescribed Viagra.  AR at 262, 331.  On July 20, 2005,

23  Plaintiff saw Dr. Dopko for a follow-up.  *Id.* at 235-35, 327-28.  Dr. Dopko noted "[b]ack

24  pain not responding well to Morphine SR and Vicodin[.]"  *Id.* at 235, 327.  On July 27, 2005,

25  Plaintiff followed-up with Dr. Cary for irritative lumbar radiculopathy.  *Id.* at 255, 318.  Dr.

26  Cary noted that Plaintiff was using a cane and displaying an antalgic gait.  *Id.*  Dr. Cary

27  further noted that the lumbrosacral MRI peformed on July 20, 2005 "reported mild

28

1  degenerative disc bulge at L5/S1." AR at 255, 318; *see also id.* at 620-23, 845, 861-63,

2  1180.  Upon examination, Dr. Cary diagnosed irritative lumbar radiculopathy, myofascial

3  pain syndrome, and bilateral sacroiliitis.  *Id.* at 257, 320.  He recommended *inter alia*

4  continuing with the low back exercises and water aerobics, continuing with the Ten's Unit,

5  physical therapy and ultrasound treatment to the low back.  *Id.*  On July 29, 2005, Plaintiff

6  called Dr. Dopko because he fell after tripping over his dog the previous evening.  *Id.* at 322.

7  Plaintiff reported that the pain medication was not helping, and "he won't refer for surgery

8  or injections."  *Id.*

9        On August 3, 2005, Plaintiff called Dr. Dopko requesting a refill of his Toprol, which

10  Dr. Dopko called in to the pharmacy.  AR at 321.  On August 11, 2005, Plaintiff saw Dr.

11  Cary for a follow up for irritative lumbar radiculopathy.  *Id.* at 252, 315.  Dr. Cary noted that

12  Plaintiff was using a walker; however, "[h]is lumbosacral MRI only revealed mild

13  degenerative changes and his NCS of the lower-limbs were normal."  *Id.*  Dr. Cary further

14  stated that "[a]t this point, I will not prescribe any narcotic medication for him as the record

15  shows."  *Id.*  Dr. Cary reported the same diagnosis as indicated on the July 27, 2005 exam.

16  *Id.* at 254, 317.  He recommended *inter alia* continuing with the low back exercises and

17  water aerobics, continuing with the Ten's Unit, proceeding to physical therapy, a bilateral

18  lower limb venous Doppler to rule out deep vein thrombosis, referral to a neurosurgeon and

19  pain clinic.  AR at 254, 317.  The Doppler showed "[n]ormal study with no evidence of deep

20  venous thrombosis of either lower extremity."  *Id.* at 617-19, 858-60, 1182.  On August 19,

21  2005, Plaintiff followed up with Dr. Dopko.  *Id.* at 312.  Dr. Dopko reported that Plaintiff's

22  low back pain was progressively worse, and Plaintiff had an inability to sit still.  *Id.*  Dr.

23  Dopko prescribed Morphine and Oxycodone.  *Id.*  Plaintiff was also seen this same date at

24  the SVRHC ED for his back pain.  AR at 613-16, 841-44.  Plaintiff was given Morphine and

25  Phenergan intravenously.  *Id.* at 616, 844.  Plaintiff was discharged to home the same day.

26  *Id.*

27        On September 3, 2005, Plaintiff was seen in the SVRHC ED for low back pain as a

28

result of a fall while walking up stairs. *Id.* at 608, 836. Plaintiff received Demerol and Phenergan intravenously, as well as injections of Toradol, Morphine Sulfate and Solumedrol. *Id.* at 611, 839. Plaintiff was discharged to home with a prescription for Medrol. AR at 611, 839. On September 16, 2005, Plaintiff reported to his chiropractor that he has been doing water aerobics, and able to do physical activity around the house. *Id.* at 1104.

On October 9, 2005, Plaintiff was seen in the SVRHC ED for low back pain. *Id.* at 603-06, 831-34. Plaintiff received injections of Dilaudid and Phenergan. *Id.* at 606, 834. Plaintiff was given prescriptions for dulcolax and Percocet and release home the same day. *Id.* On October 11, 2005, Plaintiff was seen for evaluation by physical therapist Rosalyn Richards. AR at 596, 900-03. Plaintiff's pelvis was "balanced" and he was given two stretching exercises. *Id.* Plaintiff reported that "therapy hurts and he does not want to return for physical therapy." *Id.* On October 17, 2005, Plaintiff went to a follow-up with Dr. Cary. *Id.* at 249. Plaintiff informed Dr. Cary that "Dr. Dopko had been gone or unavailable and he could not find the coverage for refill of his narcotic medication." *Id.* Dr. Cary informed Plaintiff that "this will be the only time" that he would provide a refill of the narcotics. AR at 249. Dr. Cary also notes that "Dr. Schroeder has ordered a new set of neuroimaging studies from the cervical through the lumbar regions looking for a 'spinal tumor.'" *Id.* Dr. Cary's diagnosis remained unchanged, and recommended *inter alia* continuing with the low back exercises, water aerobics and Ten's Unit, to proceed to pulmonology evaluation with Dr. Youssef, and continuing to follow Dr. Schroeder's recommendations. *Id.* at 251. Dr. Cary prescribed Vicodin and recommended that Plaintiff "[r]eturn in follow up in 8 weeks since I have nothing further to offer this patient within the limited parameters that he has dictated." *Id.* On October 22, 2005, Plaintiff was seen at the SVRHC ED for chronic back pain. *Id.* at 592-95, 826-29. Plaintiff reported being out of pain medication and "[m]y doctor dumped me (Dopko)." AR at 594, 828; *see also id.* at 1105. Plaintiff was given two injections of Dilaudid and one of Phenergan. *Id.* at 595. He was released home the same day with prescriptions for Percocet and Flexeril. *Id.* On October 31, 2005, Plaintiff's

1    chiropractor reported that Plaintiff "[o]penly admits he's having some real problems

2    withdrawing from [pain] meds. . . . Has a lot of trembling & shaking & legs very

3    hyperactive." *Id.* at 1105.

4          On November 5, 2005, Plaintiff had MRIs of the thoracic spine and lumbar spine. *Id.*

5    at 299, 650-51.  On November 11, 2005, Plaintiff was seen in the SVRHC ED for chronic

6    back pain.  AR at 587, 821.  Plaintiff was given injections of Dilaudid, Phenergan and

7    Vicodin, and released to home the same day. *Id.* at 590, 824.  On November 19, 2005,

8    Plaintiff called Dr. Dopko's office requesting medication refills. *Id.* at 310.  Dr. Dopko gave

9    prescriptions for Morphine and Lortab.  *Id.*   The note indicates that Plaintiff has an

10   appointment with a neurosurgeon scheduled and "that this is the last time that he will need

11   the rx's from [Dr. Dopko]." *Id.*

12         On December 11, 2005, Plaintiff was seen in the SVRHC ED after a fall several days

13   prior.  AR at 580, 811.  An x-ray of his sacrum and coccyx revealed "a mildly displaced

14   coccygeal fracture." *Id.* at 584, 818.  An L-Spine x-ray showed anatomical alignment and

15   "[d]egenerative disc disease of moderate degree noted at T10-T11. *Id.* at 585, 819.  Plaintiff

16   received injections of Morphine and Phenergan. *Id.* at 583.  On December 12, 2005, Plaintiff

17   followed up with Dr. Cary. *Id.* at 246.  Plaintiff told Dr. Cary "that he has gone off of all of

18   the narcotic medications and . . . that he feels better."  AR at 246.  Dr. Cary diagnosed

19   irritative lumbar radiculopathy with MRI documented mild L5/S1 degenerative disc bulge,

20   myofascial pain syndrome and bilateral sacroiliitis. *Id.* at 248.  On December 27, 2005,

21   Plaintiff reported to his chiropractor, after a long weekend at Disneyland, that "he must have

22   walked five miles." *Id.* at 1107.

23         On January 4, 2006, Plaintiff was seen in the SVRHC ED after a fall in the bathtub.

24   *Id.* at 574-77, 808-11.  Plaintiff received two injections of Dilaudid and one injection each

25   of Phenergan and Toradol. *Id.* at 577, 811.  Plaintiff was then discharged to home with a

26   prescription for Vicodin.  AR at 577, 811.  On January 5, 2006, Plaintiff had a CT L-Spine,

27   which was read by Dr. Osumi who reported "[n]o acute bony injury identified.  No evidence

28
                                        - 10 -

of herniated disc or spinal stenosis." *Id.* at 572, 812.  On January 24, 2006, Plaintiff reported to his chiropractor that he had a really good workout at the gym the previous evening and was building some cabinets at home.  *Id.* at 1108.

On February 6, 2006, Plaintiff followed up with Dr. Cary for irritative lumbar radiculopathy.  Plaintiff reported that "he has remained off of all narcotic medications . . . [and] that he does feel better [.]" *Id.* at 243.  Dr. Cary's impressions remain unchanged from previous examinations. *Id.* at 245.  Dr. Cary recommended *inter alia* continuing with the low back exercises, water aerobics, and Ten's Unit, and a rheumatology evaluation.  AR at 245. Dr. Cary also prescribed Neurontin as a pain modulator.  *Id.*  On February 17, 2006, Plaintiff was seen in the SVRHC ED for back pain.  *Id.* at 567-70, 803-06.  Plaintiff received injections of Valium and Dilaudid, and was discharged to home the same day. *Id.* at 570, 806.  On February 21, 2006, Plaintiff had his initial consult with Kathleen Jones, M.D. and reported that he had been fired from Dr. Dopko due to his "med usage." *Id.* at 986.  Plaintiff further reported doing exercises at home and at the gym for his low back pain.  AR at 986.

On March 9, 2006, Plaintiff followed up with Dr. Jones.  *Id.* at 983.  He had been seen at the ED prior to the visit, and stated that "he has plenty of Oxycodone now." *Id.*  On March 21, 2006, Plaintiff reported to his chiropractor that he had been working on some tiling of a countertop.  On March 26, 2006, Plaintiff was seen in the SVRHC ED reporting that he had seen a chiropractor two (2) days prior, but then got worse. *Id.* at 559, 798.  Plaintiff received two injections of Dilaudid and one injection of Phenergan.  AR at 562, 801.  Plaintiff was released home the same day, with a prescription for Valium. *Id.*  On March 28, 2006, Plaintiff reported to his chiropractor that he had tried lifting some cabinets up into place. *Id.* at 1110.

On April 10, 2006, Plaintiff followed up with Dr. Jones. *Id.* at 980.  On April 11, 2006, Plaintiff was seen in the SVRHC ED after falling while waiting for a "lung test." *Id.* at 551, 791.  X-rays of his thoracic and lumbar spine were normal.  AR at 555-56, 795-96. Plaintiff was given injections of Dilaudid and Phenergan, and discharged to home on the

same day. *Id.* at 554, 794.  On April 25, 2006, Plaintiff was seen in the SVRHC ED because he fell walking down steps.   *Id.* at 546-49, 786-89.   Plaintiff received Morphine intravenously, and was discharged to home the same day. *Id.* at 549, 789.

On April 26, 2006, Plaintiff was seen in the SVRHC ED as a result of his walker breaking. *Id.* at 535, 870.  He grabbed a countertop, which fell on his feet and ankles.  AR at 535, 528, 870, 880.  Plaintiff received Dilaudid, Phenergan and Valium intravenously. *Id.* at 538-39, 873.  Regarding Plaintiff's falls, Dr. Jones stated that she did "not thing [sic] there is any evidence that this is a cardiac or syncopal or seizure disorder." *Id.* at 530, 882, 1086. Dr. Jones further stated "It appears though that his pain tolerance is either very low or his level of pain seems out of proportion with all of the clinical findings we can see.  I am concerned about narcotic dependency." *Id.* X-rays of Plaintiff's right hip and ankles showed no fracture or dislocation. *Id.* at 888-93, 1092-94.  On April 28, 2006, Plaintiff was seen by Dr. Cary who reported:

> Evaluation in the hospital with x-rays of feet and ankles revealed no fractures. The patient's evaluation has included lumbosacral MRI of 10/2005 reporting L5-S1 disc bulge without nerve impingement.  He also had undergone nerve conduction ECG which was normal.  He and [sic] been using a TENS unit.  He has apparently been making frequent visits to the prescription [sic] for IV narcotics for the pain in his back.

AR at 524, 883; *see id.* at 526-27, 533.  Dr. Cary commented that he had discussed the need for significant weight loss with Plaintiff. *Id.* at 525, 884.  Further, Dr. Cary noted an "[a]pparently low pain threshold and frequent reliance on narcotic medications, at least in the emergency room." *Id.* On April 29, 2006, Dr. Jones reported in her discharge summary that she had discussed the need for Plaintiff to keep a normal activity level. *Id.* at 522, 878, 1080. Dr. Jones further stated "[i]t is unclear to me why this patient is falling.  His physical examination demonstrates extremely good strength throughout.   His neurological examination is essentially normal." *Id.* Further, in her progress notes for the same day, Dr. Jones stated that Plaintiff's "strength is great and no reason for 'knees to give out[.]'" AR at 887.

1     On May 8, 2006, Plaintiff followed up with Dr. Jones. *Id.* at 977. Plaintiff reported

2 that acupuncture helped, but that he felt it was wearing off. *Id.* Plaintiff also reported

3 walking around Patagonia the previous weekend and riding his bike the previous day. *Id.*

4 On May 9, 2006, Plaintiff was referred to Michael J. Decker, M.D.'s pain clinic by Dr. Jones.

5 *Id.* at 498, 520, 868, 1077. The treatment plan was for three lumbar epidural steroid

6 injections. AR at 498, 520, 868, 1077. Dr. Decker's physical examination was "essentially

7 unremarkable except for a moderately overweight middle aged male." *Id.* at 520. Plaintiff

8 received the first injection on May 26, 2006, but never returned for any follow-up. *Id.* at 498,

9 868, 1077. Plaintiff informed the clinic that his insurance would not pay for the injections,

10 so he would not return. *Id.* at 1079. As such, Dr. Decker discharged him from the clinic.

11 *Id.* On May 30, 2006, Plaintiff complained to his chiropractor saying that the first injection

12 gave him no benefit whatsoever, and it was $1200 down the drain[.]" AR at 1112.

13     On June 12, 2006, Plaintiff was seen in the SVRHC ED because he "ran out of

14 Oxycodone." *Id.* at 513, 781. Plaintiff received two shots of Dilaudid and one of Phenergan

15 for his low back pain. *Id.* at 516, 784. Plaintiff was discharged to home the same day with

16 a prescription for Percocet. *Id.* On June 19, 2006, Plaintiff followed up with Dr. Jones. *Id.*

17 at 974-75. Dr. Jones refused to increase his Oxycodone or refill it before one month. AR

18 at 975.

19     On July 14, 2006, Plaintiff was seen in the SVRHC ED for right hip pain as a result

20 of a fall because of his legs giving out. *Id.* at 505-09, 774-77, 1062-66. Plaintiff received

21 three shots of Morphine, two shots each of Valium and Phenergan, and one shot of Dilaudid.

22 *Id.* at 508-09, 777, 1066. Plaintiff had a x-ray of his right hip. *Id.* at 499, 502, 511, 765-66.

23 The x-ray showed a "[n]ormal right hip." *Id.* On the same date, a radiology report for

24 Plaintiff's CT L-Spine showed "[b]road-based disc bulges, L4-L5 and L5-S1. AR at 500,

25 503, 510, 763-64, 778-79, 1074-75. No evidence of fracture or focal herniated nucleus

26 pulposus." *Id.* at 500, 503, 510, 763-64, 778-79. On July 27, 2006, Plaintiff followed up

27 with Dr. Jones. *Id.* at 971. Plaintiff reported that he had four (4) physical therapy visits with

28                                    - 13 -

1    no improvement in pain or gait, and that he is exercising in the pool. *Id.*

2          On August 2, 2006, Plaintiff was seen in the SVRHC ED because he dropped

3    plywood on his feet and fell on his buttocks. *Id.* at 490-93, 768-71, 1041-43. Plaintiff was

4    given shots of Morphine and Promethazine. AR at 493, 770, 1043. A bilateral foot x-ray

5    showed "[n]ormal bilateral feet." *Id.* at 494, 772, 1044. Plaintiff was released home the

6    same day. *Id.* at 493, 771, 1043. On August 14, 2006, Plaintiff was seen by Dr. Jones and

7    reported that he had finished physical therapy and it did not really help long term. *Id.* at 968.

8    Plaintiff also reported taking extra Oxycodone for the injury to his foot. *Id.*

9          On September 5, 2006, Plaintiff was seen by Keith Gonzalez, M.D. for a consultation.

10   AR at 1293-95. Dr. Gonzalez noted "[l]ow back pain with essentially normal lumbar

11   imaging. His pain is almost certainly not from a neurological lesion involving nerve roots

12   or peripheral entrapment. There is no reason to presume a more central reason for his pain

13   syndrome." *Id.* at 1295. Dr. Gonzales recommended "psychological counselling [sic] for

14   management of his chronic pain." *Id.* at 1295. On September 7, 2006, Plaintiff was seen in

15   the SVRHC ED for chronic low back pain. *Id.* at 485-88, 759-62. Plaintiff received one

16   injection each of Demerol, Phenergan and Dilaudid. *Id.* at 488, 762. Plaintiff was

17   discharged home the same day. AR at 488, 762. On September 12, 2006, Plaintiff was seen

18   by Dr. Jones following up on his increased low back pain. *Id.* at 965. On September 28,

19   2006, Kristen A. Ray, N.P. reported to Dr. Jones regarding her consultation with Plaintiff.

20   *Id.* at 656-58. Plaintiff reported a history of intravenous drug use from 1987 to

21   approximately 1990, denied alcohol for about four (4) years and no tobacco or drugs. *Id.* at

22   656.

23         On October 1, 2006, Plaintiff was seen in the SVRHC ED for chronic low back pain.

24   *Id.* at 479-83, 754-57. The triage notes indicate that "from previous ED visits Dilaudid has

25   controlled pain." AR at 483, 757. Plaintiff was given one injection each of Dilaudid and

26   Phenergen. *Id.* Plaintiff was discharged home with a prescription for Oxycontin. *Id.* On

27   October 4, 2006, Plaintiff followed up with Dr. Jones. *Id.* at 962. Plaintiff reported still

28

going to the gym three (3) times per week for water exercises. *Id.* On October 28, 2006, Plaintiff was seen in the SVRHC ED for acute myofascial lumbar strain. AR at 475-78, 749-52. Plaintiff received three injections of Dilaudid, and one injection each of Toradol and Phenergan. *Id.* at 478, 752. Plaintiff was discharged to home. *Id.* On October 29, 2006, Plaintiff was seen in the SVRHC ED for low back pain. *Id.* at 472, 746. The triage notes indicate that "Dilaudid seems to work – seen a few days ago in ED was given 3 shots for pain." *Id.* He received one injection of Dilaudid, and was discharged. AR at 473, 747.

On November 15, 2006, Plaintiff was seen in the SVRHC ED complaining of pain and tingling in both calves. *Id.* at 467, 741. Plaintiff left after triage, and without further treatment. *Id.* at 468, 742.

On December 8, 2006, Plaintiff was seen in the SVRHC ED because he tripped over his dog and fell backwards on to the stairs. *Id.* at 460, 462, 734, 736. Plaintiff was given Morphine and Phenergan intravenously, and Dilaudid and Phenergan intramuscularly. *Id.* at 463, 737. A limited L-Spine x-ray taken the same day showed a "[n]ormal lumbosacral spine." AR at 464, 738. The same day, Plaintiff was discharged to home with a prescription for Oxycodone. *Id.* at 463, 737.

On January 9, 2007, Plaintiff saw Dr. Jones regarding a skin lesion behind his ear. *Id.* at 959. Dr. Jones advised him to restart his exercise program to alleviate his chronic back pain. *Id.* at 960.

On February 10, 2007, Plaintiff was seen in the SVRHC ED complaining of back pain. *Id.* at 455, 730. Plaintiff was given two injections of Dilaudid, and one injection each of Toradol, Valium and Phenergan. AR at 456, 731. Plaintiff was discharged home the same day. *Id.* On February 24, 2007, Plaintiff was seen at the SVRHC ED, complaining of a migraine with pain running all the way down the spine. *Id.* at 448, 722. Plaintiff was given two shots of Dilaudid, and one each of Phenergan and Toradol. *Id.* at 449, 723. Plaintiff slipped and fell en route to the bathroom while in the ED. *Id.* at 449, 723. A x-ray of his pelvis, sacrum and coccyx revealed all were normal. AR at 450-51, 724-25. Plaintiff was

1  discharged home with prescriptions for Percocet and MS Contin. *Id.* at 449, 723.

2          On March 16, 2007, Plaintiff was seen at the SVRHC ED complaining of three (3) to

3  four (4) weeks of neck pain, headache and back ache. *Id.* at 443, 714. He further stated that

4  "home pain meds ineffective[.]" *Id.* Plaintiff received two shots of Dilaudid and Valium and

5  and one of Phenergan. *Id.* at 444, 715. Plaintiff was discharged home with a prescription

6  for MS Contin. AR at 444, 715. On March 17, 2007, Plaintiff received a C-Spine. *Id.* at

7  437, 717. Dr. Osumi read the radiograph and reported "[a]nterior fusion of C5-C6 is stable,

8  with degenerative disc disease noted at C4-C5, stable compared to previous study of

9  04/25/06." *Id.* On March 29, 2007, Plaintiff saw Dr. Jones complaining of headaches. *Id.*

10 at 953.

11         On April 23, 2007, Plaintiff was seen by Dr. Jones for swollen ankles. *Id.* at 950. She

12 increased his anti-depressant. AR at 951.

13         On May 3, 2007, Plaintiff was seen at the SVRHC ED. *Id.* at 435-36, 707-10.

14 Plaintiff reported that he "pick[ed] up dog and felt a 'click' in back[,] now feels extreme

15 pressure." *Id.* at 435, 709. Plaintiff was given two injections of Dilaudid and Valium, and

16 one injection of Phenergan. *Id.* at 436, 710. Plaintiff was discharged home. *Id.* On May

17 16, 2007, Plaintiff saw Bridget Walsh, D.O. for joint pain. Plaintiff reported "[h]ot [t]ub –

18 a little help; PT no help; Ibupfoen [sic], Naproxen no help; [m]uscle relaxants – little help

19 (Robaxin, Flexeril, Soma); Epidural steroid injeciton [sic] no help; Neurontin no help; TENs

20 helps a little sometimes; Has tried Morphine OxyContin which didn't help but unsure of the

21 dose, Oxcodone 5 mg up to 5 a day helped, Prozan and Nortriptyline no help." AR at 395,

22 430. Dr. Walsh notes that Plaintiff gardens and does house work for exercise. *Id.* Dr.

23 Walsh's assessment noted:

24          I know most of his trouble is with his low back but I am bothered by his
            inflammatory process in his ankles and toes. I wonder if this is related to his
25          Hepatitis C or a seronegative spondyloarthropathy. I agree w/ treating his Hep
            C. I will check some serologies and get xrays of his hands and feet and he will
26          bring hi [sic] prior LS spine xrays for me to review. I think we need to be a
            little more aggressive with his pain management especially since the treatment
27          for Hep C is so difficult. I am willing to write for this and left a message with

28
                                               - 16 -

1   primary – hopefully it is OK.  I have reviewed risks and rules of opioids.  If he
2   is still having synovitis and stiffness I will consider starting Plaquenil at his
    next visit.

3   *Id.* at 396, 431.

4       On July 3, 2007, Plaintiff saw Dr. Walsh for a follow up for joint pain and low back

5   pain.  Plaintiff reported that he was "[o]verall better but the morphine doesn't last the full 12

6   hours." *Id.* at 390, 416, 1014.  Moreover, he "[r]an out of Oxycodone – Baclofen helps but

7   needing it [twice a day]." *Id.*  Dr. Walsh reports that x-rays of his hands and wrists and feet

8   and ankles were normal, and his C Spine showed a stable s/p fusion.  *Id.*; *see also id.* at 392-

9   94, 418-27.  Dr. Walsh also noted, "I wonder if he has an inflammatory arthritis related to

10  his Hep C.  If pain persists after Hep C treatment will consider Plaquenil." AR at 391, 417.

11  On July 13, 2007, Kristen Ray, N.P. reported discussing with Plaintiff "the possibility that

12  his pain control will become more difficult to manage on therapy." *Id.* at 677.  Furthermore,

13  "[t]he estimated course of treatment is 24 weeks." *Id.*  On July 21, 2007, Plaintiff was seen

14  at SVRHC ED for headache.  *Id.* at 701-04.  Plaintiff was given Dilaudid and Phenergan and

15  discharged to home the same day.  *Id.* at 703.  On August 5, 2007, Dr. Jones filled out a

16  Multiple Impairment Questionnaire.[3] AR at 378-80.  Dr. Jones lists her diagnosis as chronic

17  pack pain, Hepatitis C, diffuse arthralgias, depression, and hypertension.  *Id.* at 378.  Plaintiff

18  notes that the records contains only three (3) pages of this eight (8) page questionnaire.  Pl.'s

19  Opening Brief (Doc. 21) at 6.  Furthermore, Plaintiff supplied the appellate counsel with the

20  entirety of the questionnaire, which does not appear in the administrative record.  *See id.*

21  Plaintiff has not provided this Court with a copy of the questionnaire in its entirety.  Dr.

22  Jones's progress notes this same date discuss that Plaintiff's Hepatitis C treatment will last

23  for six (6) months.  AR at 944.

24      On October 3, 2007, Plaintiff saw Dr. Walsh reporting "[p]ain [from the] waist down."

25

26  _____

27  [3]The Questionnaire contained in the record is undated.  The Court relies on the date
    provided in Plaintiff's Opening Brief (Doc. 21).

28

1    *Id.* at 387, 413.  Plaintiff "[w]as camping and ran out of meds a few days ago.  He had no

2    pain meds." *Id.*  Plaintiff also reported to Dr. Walsh that "[m]orphine helps – [but] he ran

3    out – [he] thinks [he] took too many." *Id.*  Plaintiff told Dr. Walsh that he takes the morphine

4    twice daily, "but [it] has not been holding him for the full 12 hours." *Id.*  Plaintiff also states

5    that he is "[h]aving treatment for Hep C but not responding. [H]as another month."  AR at

6    387, 413.  Plaintiff also had a follow-up appointment with Dr. Jones on the same date.  *Id.*

7    at 941-42.  Plaintiff was having intermittent increased heart rate, but "won't go to ER as his

8    co-pay is very high." *Id.* at 942, 943.  On October 8, 2007, Plaintiff had a lumbrosacral spine

9    x-ray, which reported a "[n]ormal lumbosacral spine[.]" *Id.* at 386, 412.  Dr. Walsh reports

10   that Plaintiff does get exercise including gardening and house keeping.  *Id.* at 387, 413.

11   Regarding his low back pain, Dr. Walsh continued his Oxycodone, increased MS Contin,

12   continued Baclofen and increased Lyrica.  AR at 388, 414.  Dr. Walsh again noted, "I

13   wonder if he has an inflammatory arthritis related to his Hep C.  If pain persists after Hep C

14   treatment will consider Plaquenil." *Id.*

15       On January 22, 2008, Plaintiff followed up with Dr. Walsh.  Dr. Walsh reported "[h]is

16   L spine plain films were normal." *Id.* at 384.  Dr. Walsh states that Plaintiff is tolerating the

17   Lyrica, but is unsure whether it is helping. *Id.*  She further states that Plaintiff is "[h]aving

18   withdrawal symptoms when [he] misses doses of Morphine." *Id.*  Dr. Walsh's assessment

19   include low back pain, unspecified inflammatory polyarthropathy, Hepatitis C, and long-term

20   anti-inflamtry [sic].  AR at 385.

21       Pursuant to a  request by the Commissioner, Plaintiff was examined by Machelle

22   Martinez, Ph.D. *Id.* at 1120-24.  Dr. Martinez reported that Plaintiff had adequate attention

23   and concentration. *Id.* at 1121.  Further, she noted mild symptoms of depression and anxiety

24   were reported. *Id.*  Plaintiff's medical records were also reviewed by Robert S. Hirsch, M.D.

25   and a Physical Residual Functional Capacity Assessment completed based upon that review.

26   *Id.* at 1125-32.  Jaine Foster-Valdez completed a Psychiatric Review Technique and a Mental

27   Residual Functional Capacity Assessment.  AR at 1133-50.  The period for which Plaintiff

28                                          - 18 -

1   seeks disability is from November 19, 2004 to March 31, 2008.  *See* AR at 28, 36.

2

3   **II.   STANDARD OF REVIEW**

4         The factual findings of the Commissioner shall be conclusive so long as they are

5   based upon substantial evidence and there is no legal error.  42 U.S.C. §§ 405(g), 1383(c)(3);

6   *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).  This Court may "set aside the

7   Commissioner's denial of disability insurance benefits when the ALJ's findings are based

8   on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*

9   *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).

10         Substantial evidence is "'more than a mere scintilla[,] but not necessarily a

11   preponderance." *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871,

12   873 (9th Cir. 2003)); *see also Tackett*, 180 F.3d at 1098.  Further, substantial evidence is

13   "such relevant evidence as a reasonable mind might accept as adequate to support a

14   conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).  Where "the evidence can

15   support either outcome, the court may not substitute its judgment for that of the ALJ."

16   *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992));

17   *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).  Moreover, the court may

18   not focus on an isolated piece of supporting evidence, rather it must consider the entirety of

19   the record weighing both evidence that supports as well as that which detracts from the

20   Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

21

22   **III.   ANALYSIS**

23         The Commissioner follows a five-step sequential evaluation process to assess whether

24   a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as follows:

25   Step One asks is the claimant "doing substantial gainful activity[?]" If yes, the claimant is

26   not disabled;  Step Two considers if the claimant has a "severe medically determinable

27   physical or mental impairment[.]" If not, the claimant is not disabled;  Step Three determines

28                                           - 19 -

1  whether the claimant's impairments or combination thereof meet or equal an impairment

2  listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1.  If not, the claimant is not disabled; Step Four

3  considers the claimant's residual functional capacity and past relevant work.  If claimant can

4  still do past relevant work, then he or she is not disabled; Step Five assesses the claimant's

5  residual functional capacity, age, education, and work experience.  If it is determined that the

6  claimant can make an adjustment to other work, then he or she is not disabled.  20 C.F.R. §

7  404.1520(a)(4)(i)-(v).

8      In the instant case, the ALJ found that Plaintiff was not engaged in substantial gainful

9  activity during the period from his alleged onset date of November 19, 2004 through March

10 31, 2008, his date last insured.  AR at 28.  Plaintiff was determined to have the following

11 severe impairments: "degenerative disc disease of the lumbar spine; hepatitis C; [and] obesity

12 (20 CFR 404.1520(c)."  *Id.*  The ALJ further found that Plaintiff's "medically determinable

13 mental impairments of depression and anxiety, considered singly and in combination, did not

14 cause more than minimal limitation in the claimant's ability to perform basic mental work

15 activities and were therefore nonsevere."  *Id.* at 30.  At step three, the ALJ found that

16 Plaintiff "did not have an impairment or combination of impairments that met or medically

17 equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR

18 404.1520(d), 404.1525 and 404.1526).  *Id.* at 31.  At step four, the ALJ found that Plaintiff

19 was unable to perform his past relevant work.  *Id.* at 34.  At step five, the ALJ determined

20 that "the claimant had the residual functional capacity to perform light work as defined in 20

21 CFR 404.1567(b) except he can only perform postural functions (i.e. climbing, balancing,

22 stooping, kneeling, crouching, crawling) occasionally and he is limited to simple unskilled

23 work."  *Id.* at 31.  Based upon her assessments, the ALJ found that "[t]he claimant was not

24 under a disability" during the relevant period.  *Id.* at 36  Plaintiff asserts that the ALJ erred

25 in  1) rejecting Dr. Jones's opinion and 2) finding Plaintiff not credible.  Pl.'s Opening Brief

26 (Doc. 21) at 8, 11.

27   . . .

28

1

### A.     Plaintiff's Credibility

2   "To determine whether a claimant's testimony regarding subjective pain or symptoms

3   is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 204 F.3d

4   1028, 1035-36 (9th Cir. 2007).  First, "a claimant who alleges disability based on subjective

5   symptoms 'must produce objective medical evidence of an underlying impairment which

6   could reasonably be expected to produce the pain or other symptoms alleged[.]'" *Smolen v.*

7   *Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341,

8   344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *See also Lingenfelter*, 504 F.3d

9   at 1036.  Further, "the claimant need not show that [his] impairment could reasonably be

10  expected to cause the severity of the symptom [he] has alleged; [he] need only show that it

11  could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282

12  (citations omitted).  "[I]f the claimant meets this first test, and there is no evidence of

13  malingering, 'the ALJ can reject the claimant's testimony about the severity of [his]

14  symptoms only by offering specific, clear and convincing reasons for doing so.'"

15  *Lingenfelter*, 504 F.3d 1028 (quoting *Smolen*, 80 F.3d at 1281).  "Factors that an ALJ may

16  consider in weighing a claimant's credibility include reputation for truthfulness,

17  inconsistencies in testimony or between testimony and conduct, daily activities, and

18  'unexplained, or inadequately explained, failure to seek treatment or follow a prescribed

19  course of treatment.'" *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (quoting *Fair v.*

20  *Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

21  Here, the ALJ "determined that the claimant has an underlying medically determinable

22  impairment that could possibly produce some pain or other symptoms[.]" AR at 32.  As such,

23  Claimant has met the first step.  *See Smolen*, 80 F.3d at 1281-82.  The ALJ further states that

24  "the allegations exceed the limitations reasonably expected from the medical findings."  AR

25  at 32.  "For example, claimant's treating and examining physicians consistently characterized

26  the impairments as 'minimal', 'mild', 'slight', 'normal' and 'unremarkable', with reference

27  to the clinical and laboratory findings, which seems quite disproportionate to the severity of

28

pain claimant has alleged." *Id.* (punctuation errors in original).  Plaintiff argues that the ALJ places too much weight on the language contained within the diagnostic records characterizing impairments as "minimal," "mild," "slight," "normal," and "unremarkable." Pl.'s Opening Brief (Doc. 21) at 12.  Plaintiff's treating physicians, however, consistently question his pain level.  Dr. Jones noted "[i]t appears though that his pain tolerance is either very low or his level of pain seems out of proportion with all of the clinical findings we can see.  I am concerned about narcotic dependency."  *Id.* at 530, 882, 1086.  Dr. Cary noted Plaintiff's need for significant weight loss, as well as his  "[a]pparently low pain threshold and frequent reliance on narcotic medications, at least in the emergency room."  *Id.* at 525, 884.  Such comments by the physicians, as well as their reports documenting essentially normal results in diagnostic tests support the ALJ's finding.

Second, the ALJ points to Plaintiff's "non-compliance with the medical regimen specified by his physicians."  AR at 32.  The ALJ points to Plaintiff's receipt of "one epidural injection and refus[al] [of] the rest."  *Id.*  Plaintiff argues that lack of a means to pay, does not constitute "noncompliance" in a credibility inquiry.  *See Smolen*, 80 F.3d at 1284. The record, however, indicates that Plaintiff exhibited a pattern of either rejecting or limiting his treatment.  For example, Dr. Cary stated "I have nothing further to offer this patient within the limited parameters that he has dictated."  *Id.* at 251.  Similarly, after one physical therapy visit, Plaintiff reported that "therapy hurts and he does not want to return for physical therapy."  AR at 596, 900-03.

Third, the ALJ states that "[t]wo common side effects of prolonged and/or chronic pervasive pain are weight loss and diffuse atrophy or muscle-wasting."  AR at 32.  She goes on to state that "[t]here is no record of the claimant having lost weight . . [and] that pain has apparently not altered the use of his muscles and joints to the extent that it has resulted in diffuse atrophy or muscle-wasting."  *Id.*  Plaintiff argues that "[t]he ALJ is not a physician, and she is certainly not free to treat the absence of symptoms she believes Mr. Eisenlord should have exhibited as medical evidence undermining his credibility."  Pl.'s Opening Brief

1   (Doc. 21) at 15; *see Tackett v. Apfel*, 180 F.3d 1094, 1102 (9th Cir. 1999).  The records do

2   reflect, however, that Plaintiff did not suffer from muscle atrophy.  *See, e.g.,* AR at 279, 353

3   (Dr. Cary consistently reported that "[t]here is no atrophy seen in either lower extremity.");

4   AR at 887 (Dr. Jones stated that Plaintiff's "strength is great and no reason for 'knees to give

5   out[.]'").  Such statements are further indication that the objective medical evidence does not

6   support Plaintiff's subjective complaints.

7        Fourth, the ALJ also found inconsistencies regarding claimant's daily activities.  AR

8   at 33.  Plaintiff argues that ALJ improperly inferred that claimant has maintained a somewhat

9   normal level of daily activity and interaction.  Pl.'s Opening Brief (Doc. 21) at 16.  Plaintiff's

10  medical records and statements to third-parties, such as his chiropractor, indicate that

11  contrary to the limited daily activities that he testified to at his hearing, Plaintiff has led a

12  relatively normal life.  *See, e.g.,* AR at 1107 (Plaintiff reported to his chiropractor, after a

13  long weekend at Disneyland, that "he must have walked five miles."); AR at 387, 413

14  (Plaintiff "[w]as camping and ran out of meds a few days ago.  He had no pain meds" and

15  reported exercise including gardening and house keeping.); AR at 977 (Plaintiff walked

16  around Patagonia the previous weekend and rode his bike the previous day); AR at 1108

17  (Plaintiff had a really good workout at the gym and was building some cabinets at home).

18       Finally, the ALJ questioned Plaintiff's use of narcotics.  AR at 33.  Plaintiff argues

19  that this is based on "yet another indisputable mischaracterization of the record" and as such

20  "amounts to nothing."  Pl.'s Opening Brief (Doc. 21) at 16.  The record shows that Plaintiff

21  repeatedly sought narcotics at the SVRHC ED.  In fact, Plaintiff was not always truthful to

22  his treating physicians about his narcotics use.  For example, on December 11, 2005, Plaintiff

23  was seen in the SVRHC ED after a fall several days prior.  AR at 580, 811.  Plaintiff received

24  shots of Morphine and Phenergan.  *Id.* at 583.  On December 12, 2005, Plaintiff followed up

25  with Dr. Cary.  AR at 246.  Plaintiff told Dr. Cary "that he has gone off of all of the narcotic

26  medications and . . . that he feels better."  *Id.*  Furthermore, Plaintiff reported being

27  "dumped" by his doctor because of his narcotics usage.  *Id.* at 594, 828, 986; *see also id.* at

28

1105.  Plaintiff's chiropractor also reported that Plaintiff "[o]penly admits he's having some real problems withdrawing from [pain] meds. . . . Has a lot of trembling & shaking & legs very hyperactive."  *Id.* at 1105.  The Court finds that the ALJ did not mischaracterize the record.

Accordingly, this Court concludes that the ALJ stated sufficient specific reasons for not fully crediting Plaintiff's testimony.

### B.    *Opinion of Treating Physician*

"The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987) (citations omitted)).  "The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)).  However, "[a] physician's opinion of disability 'premised to a large extent upon the claimant's own account of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'" *Morgan*, 169 F.3d at 602 (quoting *Fair*, 885 F.2d at 605 (citations omitted)).

Here the ALJ found that "Dr. Jones, his primary care physician opined in July 2007, that he would not be able to perform even a full range of work.  As was noted above, she appeared to be considering the expected effect of six months of treatment for hepatitis C, which was discontinued sooner than that." AR at 33.  "Furthermore, Dr. Jones apparently gives great credence to claimant's less than credible complaints." *Id.* at 34.  Plaintiff argues that "[e]ven if Dr. Jones' assessment did rely primarily on subjective reports of pain, she would have been aware of the several other physicians treating Mr. Eisenlord (Drs. Avina, Dopko, Cary and Walsh) and the fact that they, too, found his reports of pain to be credible." Pl.'s Opening Brief (Doc. 21) at 10.  Dr. Dopko ceased treating Plaintiff because of his

medication abuse. *Id.* at 594, 828, 986. Dr. Cary discussed the need for significant weight loss with Plaintiff, as well as noted his "frequent reliance on narcotic medications, at least in the emergency room." *Id.* at 525, 884. Moreover, Dr. Cary noted that he was limited in what he could do because Plaintiff restricted treatment. *Id.* at 251. After reviewing the record, the Court agrees with the ALJ that Dr. Jones's Questionnaire responses are not consistent with the medical records in this case. Furthermore, the record only includes three pages of the Questionnaire. Although, Plaintiff refers to this shortfall, no attempt was made to provide this Court with the entirety of the report. The Court finds that the ALJ's adverse credibility finding regarding Plaintiff, which this Court has upheld, supports a rejection of Dr. Jones's Questionnaire opinion which is primarily based upon Plaintiff's subjective complaints.

**IV.    CONCLUSION**

In light of the foregoing, the Court affirms the Commissioner's decision.

Accordingly, IT IS HEREBY ORDERED that:

1)    Carolyn W. Colvin, Acting Commissioner of Social Security, is **substituted as Respondent** for Michael Astrue pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and Rule 43(c)(2) of the Federal Rules of Appellate Procedure;

2)    Plaintiff's Opening Brief (Doc. 21) is DENIED;

3)    The Commissioner's decision is AFFIRMED; and

4)    The Clerk of the Court shall enter judgment, and close its file in this matter.

DATED this 25th day of March, 2013.

Bruce G. Macdonald
United States Magistrate Judge